**In re JEMSEK CLINIC, P.A., Debtor.**

**In re Joseph Gregory Jemsek, Debtor.**

**Blue Cross and Blue Shield of North Carolina, Plaintiff, Counterclaim Defendant, Counterclaim Plaintiff**

**v.**

**Jemsek Clinic, P.A. and Joseph Jemsek, M.D., an individual, Defendants, Counterclaim Plaintiffs, Counterclaim Defendants.**

Bankruptcy Nos. 06–31766, 06–31986.
Adversary No. 07–3006.

United States Bankruptcy Court,
W.D. North Carolina,
Charlotte Division.

Sept. 22, 2010.

Alan D. McInnes, Kilpatrick Stockton, LLP, Raleigh, NC, Daniel R. Taylor, Jr., Louis W. Doherty, Kilpatrick Stockton LLP, Winston–Salem, NC, Deborah L. Fletcher, Katten Muchin Rosenman LLP, L.D. Simmons, II, Mark W. Kinghorn, Helms, Mulliss & Wicker, PLLC, Charlotte, NC, for Plaintiff, Counterclaim Defendant Counterclaim Plaintiff.

Adrianne Huffman, Travis W. Moon, Hamilton Moon Stephens Steele & Martin, Anna Cotten Wright, Joseph W. Grier, III, Grier, Furr & Crisp, PA, Charlotte, NC, Michael F. Ruggio, Polsinelli Shalton Flanigan Suelthaus PC, Washington, DC, for Defendants, Counterclaim Plaintiffs Counterclaim Defendants.

**MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR (1) AN ORDER STRIKING SETTLEMENT OF JEMSEK DEFENDANTS' COUNTERCLAIMS; (2) AN ORDER REINSTATING DEFENDANTS' COUNTERCLAIMS; AND (3) FOR SANCTIONS**

J. CRAIG WHITLEY, Chief Judge.

**THIS MATTER** was before the Court on January 19, 2010 for a hearing on Defendants', Joseph Gregory Jemsek, M.D. ("Jemsek") and the Jemsek Clinic P.A. (collectively, the "Jemsek Defendants") Motion for (1) an Order Striking Settlement of Jemsek Defendants' Counterclaims, (2) for an Order Reinstating Defendants' Counterclaims, and (3) for Sanctions ("Motion"). Motion, Docket No. 144. That Motion has been amended twice to delete additional and alternate requests for relief. The same is now confined to a request for sanctions against Plaintiff Blue Cross And Blue Shield Of North Carolina ("BCBSNC"), albeit sanctions of breathtaking proportions. Both sides extensively briefed these matters prior to and following the hearing.

## I. INTRODUCTION

### A. The Jemsek Defendants' Motion

The Motion maintains that, over the course of this adversary proceeding ("Adversary Proceeding"), BCBSNC intentionally concealed from this Court, the Jemsek Defendants, and their creditors the fact that it was simultaneously defending substantially identical claims to the Jemsek Defendants' counterclaims in a federal class action in the Southern District of Florida. That multidistrict class action litigation ("MDL") was encaptioned *Rick Love, M.D., et al. v. Blue Cross and Blue Shield Association, et al.* (formerly *Thomas, et al. v. Blue Cross and Blue Shield Association, et al.*), Case No. 1:03-cv-21296-FAM, 2008 WL 4097607 (the "*Love Case*").

Further, the Motion asserts that BCBSNC maintained this subterfuge until after the Florida class action was settled (the "Settlement"), the opt-out period ran, and it was too late for the Jemsek Defendants to even participate in the Settlement.

Finally, the Motion avers that in order to conceal the existence of the class action, BCBSNC violated a variety of applicable court rules and/or legal duties, including: a) the Federal Rules of Civil Procedure discovery rules;[1] b) the procedural rules applicable to MDL;[2] and c) the Federal Rules of Bankruptcy Procedure (the "FRBP").[3]

The Motion maintains that, as a proximate result of BCBSNC's subterfuge, the Jemsek Defendants and their creditors lost all but two of their counterclaims;

---

[1] e.g. providing misleading and incorrect discovery responses, failing to produce relevant documentation as requested in discovery, failing to make complete and timely disclosures, and failing to supplement its initial disclosures (the "Initial Disclosures").

[2] e.g. failing to notify the Judicial Panel on Multidistrict Litigation ("JPML") and the two courts.

[3] e.g. failing to plead affirmative defenses in this action.

counterclaims which have an alleged aggregate value exceeding $20 million.[4] The Jemsek Defendants also assert that, as a result of the concealment, they needlessly expended hundreds of thousands of dollars of precious estate funds defending their counterclaims in two different federal judicial districts and a circuit appeal. Finally, the Motion alleges that this fraud on the court occasioned a tremendous waste of time for this Court, the U.S. District Court for the Southern District of Florida (the "Florida Court") and the Eleventh Circuit Court of Appeals.

The Jemsek Defendants argue the concealment constituted a fraud upon a tribunal(s) and occasioned significant harm on the Jemsek Defendants, their creditors, and this Court. Therefore, extraordinary relief is sought by the Motion: a) dismissal of BCBSNC's claims against the Debtor, with prejudice; b) a monetary award equal to the value of the Jemsek Defendants' lost counterclaims; and c) reimbursement of the Jemsek Defendants' costs and attorneys' fees.

**B. The BCBSNC Response(s)**

BCBSNC denies concealing anything from the Jemsek Defendants and the court(s). BCBSNC argues that the Jemsek Defendants' motion is fatally flawed because they received the Settlement notice in time to opt out of the class.

Further, BCBSNC denies any rule violations or any acts to mislead the court(s). The insurer argues that it has not asserted the Settlement as a defense in this Adversary Proceeding and, therefore, was not obliged to plead the Settlement and injunction as an affirmative defense in its Reply. For the same reason, BCBSNC contends it was not required to disclose the Settlement in its Rule 26(a) Initial Disclosures. Fed.R.Civ.P. 26(a). BCBSNC believes it has responded fully and accurately to all written discovery requests propounded by the Jemsek Defendants. It alleges the existence of the *Love* Case was not responsive to any of those discovery requests.

## II. FACTUAL BACKGROUND & PROCEDURAL HISTORY

At the hearing, this Motion was presented upon generally uncontested facts, mostly documentary evidence gleaned from the court records of the two actions and from correspondence. Neither side presented live witness testimony, although several supporting affidavits were presented without objection. Response of BCBSNC to Second Amendment, Docket No. 158 at Ex. C.

**A. The Adversary Proceeding**

This action began in September 2006 when BCBSNC sued the Jemsek Defendants in North Carolina Superior Court. *Blue Cross and Blue Shield of North Carolina v. Jemsek Clinic, P.A. & Joseph G. Jemsek, M.D.,* No. 06–CVS–18432. BCBSNC's claims arise from medical treatments provided by the Jemsek Defendants to BCBSNC members suffering from Lyme disease. Complaint, Docket No. 2 at 9–15 (the "Complaint"). BCBSNC asserts that the Jemsek Defendants improperly submitted and were paid for hundreds of insurance claims for these patients. The Complaint seeks recovery of all sums previously paid to the Jemsek Defendants and damages under a variety of legal theories: breach of contract, fraud, unfair trade practices, negligent misrepre-

---

4. The Jemsek Defendants did not proffer an estimated value for the enjoined counterclaims but, instead, estimated the total value of all of their counterclaims to be in excess of $20 million. (Answer to Compl. in Removed Case, Countercl. of Defs Jemsek Clinic, P.A. and Joseph G. Jemsek, M.D. (the "Answer"), Docket No. 5 at 28.)

sentation, among other state law claims. Complaint, Docket No. 2 at Ex. A Part 3.

Shortly after the Superior Court case was filed, the Jemsek Defendants filed Chapter 11 and removed the state action to this Court. On January 24, 2007, the Jemsek Defendants filed their Answer, as well as nine counterclaims against BCBSNC (the "Counterclaims"), ranging from breach of contract to tortious interference with a business relationship. Answer, Docket No. 5. The Counterclaims seek an affirmative recovery from BCBSNC in excess of $20 million. *Id.* at 28. The Adversary Proceeding has been vociferously litigated and, despite best efforts to move the matter along, remains in its discovery phase.

## B. The *Love* Case

Unbeknownst to the Jemsek Defendants, at the time that BCBSNC initiated this Adversary Proceeding, it had been heavily engaged for several years defending the *Love* Case in Florida. Similar to several of the Jemsek Defendants' counterclaims in our proceeding, the *Love* complaint alleged that BCBSNC and other Blue Cross entities had adopted business practices to systematically deny, reduce or delay payments to medical providers.

## C. The Dual Proceedings

In the Adversary Proceeding, on March 8, 2007, BCBSNC replied to the Jemsek Defendants' Counterclaims, denying their contentions and asserting several defenses. BCBSNC's Reply to Countercls. and Countercls. Against Defs., Docket No. 15 (the "Reply").

Despite the similarity of the Counterclaims to those of the doctors in the Florida action, BCBSNC's Reply did not disclose the existence of the *Love* Case. None of its affirmative defenses asserted *res judicata* or release. In fact, BCBSNC

admitted that venue was appropriate in North Carolina. *Id.* at 3.

In its Reply, BCBSNC did not reveal that it was close to finalizing a settlement with the *Love* class plaintiffs that would release the counterclaims just filed by the Jemsek Defendants. *Id.* Finally, BCBSNC never amended its pleadings to disclose the pendency of the *Love* Case. *See id.*

Meanwhile in Florida, on April 27, 2007, the *Love* class plaintiffs and BCBSNC et. al. entered into the Settlement resolving the class action. Defs. Mem. In Supp. Of Their Mot. (1) For An Order Striking Settlement of Jemsek Defs' Countercls.; (2) For An Order Reinstating Defs.' Countercls.; And (3) For Sanctions, Settlement, Docket No. 145 at Ex. D. The Jemsek Defendants were not aware of the Settlement. *See id.* at Jemsek Affidavit, Ex. E.

Three days later, on April 30, 2007, BCBSNC filed its Initial Disclosures in this Adversary Proceeding, as required by Rule 7026 of the FRBP. *See id.* at Initial Disclosures, Ex. F. In those responses, BCBSNC explained in detail its affirmative defenses and its defenses to the Jemsek Defendants' Counterclaims. However, it failed to disclose that only three days earlier in Florida it had inked the Settlement with the class plaintiffs in the *Love* Case. Nor did BCBSNC disclose that the Settlement and release would enjoin, strike, and bar the Jemsek Defendants' Counterclaims in this Adversary Proceeding.

On May 31, 2007, the *Love* Court preliminarily approved the Settlement and enjoined litigation involving the class claims. *Id.* at Injunction, Ex. G. In particular, the Settlement enjoined members of the class from bringing certain "Released Claims" against "Released Parties." 2008 WL 4097607 (S.D.Fla. Sept.4, 2008). BCBSNC

was included in this group of "Released Parties". *Id.*

That release provided that:

The Releasing Parties are permanently enjoined from: (i) filing, commencing, prosecuting, intervening in, participating in (as class members or otherwise), or receiving any benefits from any lawsuit, arbitration, administrative or regulatory proceeding, or order in any jurisdiction based on any or all Released Claims against one or more Released Parties. *Love, et al. v. Blue Cross and Blue Shield Assn., et al.,*

*Id.* at \*1–2. The "Released Claims" were defined as:

any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys' fees, losses, claims, liabilities and demands of whatever kind, source or character whether arising under any federal or state law, which ... includes, but is not limited to, the Racketeer Influenced and Corrupt Organizations Act, antitrust and other statutory and common law claims, intentional or non-intentional ... arising on or before the Effective Date, that are, were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, business practices, representations, omissions, circumstances or other matters referenced in the Action, or addressed in the Settlement Agreement, whether any such Claim was or could have been asserted by any Releasing Party on its own behalf or on behalf of other Per-

sons, or to the business practices that are the subject of Section 7 of the Settlement Agreement. This includes, without limitation and as to Released Parties only, any aspect of any fee for service claim[.]

Defs. Mem. In Supp. Of Their Mot. (1) For An Order Striking Settlement of Jemsek Defs' Countercls.; (2) For An Order Reinstating Defs.' Countercls.; And (3) For Sanctions, Settlement, Docket No. 145 at Ex. D (citing *Id.* at \*4).

Although that injunction would later be deemed applicable to the Jemsek Defendants' Counterclaims, BCBSNC paid the *Love* Court's injunction no heed. It did not advise this Court or the Jemsek Defendants of the Settlement or Judge Moreno's injunction. BCBSNC continued to press forward vigorously with this Adversary Proceeding.

BCBSNC and the Jemsek Defendants thereafter engaged in extensive and rancorous discovery efforts in this Court. These actions included multiple sets of discovery, motions to compel, several hearings and a lengthy in camera document review by this Court. These post injunction discovery activities not only occasioned hundreds of thousands of dollars of legal work,[5] but also consumed hundreds of hours of this Court's time.

In Florida, the *Love* Court had sent its "opt out" notices to putative class members on July 27, 2007, with a return date deadline of September 24, 2007. Notice was also placed in major newspapers. The Jemsek Defendants received the notice, but it appears that they did not understand its significance.[6] In any event, the

---

**5.** By May 2007, over 225,000 pages of documents and five CDs of computer files had been turned over by the Jemsek Defendants to BCBSNC in discovery.

**6.** While the record is unclear, from the parties' briefs and arguments, it appears that the notices were sent to the Jemsek Defendants at their offices. They were not served on their counsel, who certainly would have reacted. Docket No. 145 at Ex. E, ¶ 6, Jemsek Aff.

Jemsek Defendants did not opt out of the class action.[7]

Meanwhile, in this Adversary Proceeding, discovery continued unabated. On October 16, 2007, BCBSNC responded to the Jemsek Defendants' first set of interrogatories, in which it denied knowledge of any pending claims against it by Lyme disease physicians. *Id.* at Ex. H, pg. 13. Because BCBSNC failed to mention the existence of other pending, related claims, this Court, Jemsek Defendants' counsel, and the body of Jemsek creditors were unaware of the *Love* Case or the Settlement. It was not until March 2008, with the parties engaged in yet another discovery dispute, that BCBSNC disclosed this information.

On March 21, 2008, and after losing (at least from its perspective) a dispute over the production of documents, BCBSNC filed a Motion for Amendment of Stay Order Pending Appeal, followed by an Amended Motion for Amendment of Stay Order on March 31, 2008 (the "Amended Motion"). Docket No. 83; Docket No. 84. In the Amended Motion, BCBSNC revealed for the first time that the Jemsek Defendants' Counterclaims were subject to a class action lawsuit pending in the Florida Court—a suit that BCBSNC had been defending for nearly five years.

The Amended Motion indicated that BCBSNC's North Carolina counsel (but not BCBSNC or its Florida attorneys) had "first learned" sometime after March 21, 2008 "that a prior order entered in the JPML captioned *Rick Love, M.D., et al. v. Blue Cross and Blue Shield Association, et al.* contains a stay applicable to virtually all of the Jemsek Defendants' counterclaims against the Plaintiff." Amended Motion, Docket No. 84.

With the Settlement finally revealed, BCBSNC acted swiftly to invoke its protections. One week later, on April 8, 2008, BCBSNC's Florida counsel wrote to the Jemsek Defendants' counsel to demand that they dismiss their Counterclaims in this Adversary Proceeding because the claims were settled in the April 27, 2007 Settlement. *See* Defs. Mem. In Supp. Of Their Mot. (1) For An Order Striking Settlement of Jemsek Defs' Countercls.; (2) For An Order Reinstating Defs.' Countercls.; And (3) For Sanctions, Docket No. 145 at Ex. I, Yinger Letter.

After ignoring the class action for almost a year, BCBSNC then moved the Florida Court to enforce the Settlement's injunction against the Jemsek Defendants. The Jemsek Defendants resisted, arguing to the Florida Court that the Counterclaims were not sufficiently identical to the released claims set forth in the Settlement.[8] The Jemsek Defendants' argument was rejected. The Florida Court found that the claims were identical and ordered the Jemsek Defendants to withdraw all but two of their Counterclaims in this Adversary Proceeding, declaring the rest to have been settled (the "Enjoined Counterclaims"). *See id.* at Ex. J, Order. The Jemsek Defendants appealed to the Eleventh Circuit Court of Appeals, which affirmed the Florida Court's decision.

7. The *Love* Court gave final approval of the Settlement on April 20, 2008. *Id.* at Ex. J, Order. In exchange for the *Love* Case defendants' establishing a settlement fund of more than $130 million and agreeing to change their business practices, the Settlement released virtually any and all claims that the medical providers within the plaintiff class may have had against the *Love* Case defendants.

8. This was the primary argument. The Jemsek Defendants also made arguments based on their status as bankruptcy debtors as to whether notice was adequate. These arguments were also rejected.

*Thomas, et al. v. Blue Cross and Blue Shield Assn., et al.,* 333 Fed.Appx. 414 (11th Cir.2009) (unpublished). Thus, the issue of whether or not the Settlement applies to the Counterclaims has been definitively decided in the context of the *Love* Case.

Faced with BCBSNC's threat to file a motion for contempt in the Florida Court, on November 25, 2008, the Jemsek Defendants requested leave to withdraw the offensive counterclaims so as to comply with the Florida Court's order. Mot. for Leave to File First Am. Countercls., Docket No. 118. On December 17, 2008, the Jemsek Defendants amended their Counterclaims (the "Amended Counterclaims") such that only two relatively minor causes of action remain: (1) defamation and (2) tortious interference with a business relationship. Defs. Jemsek Clinic, P.A. and Joseph G. Jemsek, M.D.'s First Am. Countercls., Docket No. 124. As required by the *Love* order, the Enjoined Counterclaims and related allegations no longer appear in the Amended Counterclaims. *Id.*

The Jemsek Defendants then filed the present Motion in this Court. As originally pled, it asserted that (1) the Settlement was unenforceable as to the Enjoined Counterclaims, because it had not been noticed to the creditors of these estates in accordance with FRBP 9019 and approved by this Court; (2) the Enjoined Counterclaims should be reinstated because (a) restoration would not harm BCBSNC and (b) BCBSNC waived its ability to raise release or claim preclusion; and (3) BCBSNC should be sanctioned for misleading this court and for discovery abuse. Motion, Docket No. 144.

After another threat of a contempt action in Florida by BCBSNC, the Jemsek Defendants further amended their Motion to withdraw the request to reinstate the counterclaims, while retaining the requests for sanctions and to strike the Settlement. Defs. Amendment to Defs. Mot. (1) For An Order Striking Settlement of Jemsek Defs' Countercls.; (2) For An Order Reinstating Defs.' Countercls.; and (3) For Sanctions, Docket No. 152.

This too was insufficient for BCBSNC's Florida counsel, who yet again threatened the Jemsek Defendants and their counsel with contempt in Florida unless they (1) withdrew the request to strike the Settlement and (2) ceased asking this Court to rule on the applicability of the Settlement. *See* Defs. Second Am. Mem. To Defs.' Mot. (1) For An Order Striking Settlement of Jemsek Defs' Countercls.; (2) For An Order Reinstating Defs.' Countercls.; and (3) For Sanctions ("Second Amended Motion"), Docket No. 153 at Ex. A.

Faced with contempt, the Jemsek Defendants retreated further, withdrawing their contention that the Settlement had to be approved by this Court in order to be enforceable in this Adversary Proceeding. *Id.* at 3. As such, the sole remaining issue raised by the Jemsek Defendants' Motion is whether BCBSNC should be sanctioned for failing to disclose the existence of the *Love* Case, Settlement, and injunction.

### III. DISCUSSION

The crux of the Motion is whether BCBSNC had an obligation to disclose the existence of the *Love* Case and the Settlement to the two courts, the JPML Panel and/or the Jemsek Defendants, and, if so, whether its failure to do so was intentional.

**A. As a Sanctions Matter Arising from BCBSNC's Conduct in this Court and in Connection with this Adversary Proceeding, this Motion is not Precluded by the *Love* class action or the Florida Court's Retained Jurisdiction Over the Same.**

■ As a preliminary defense, BCBSNC argues that the Florida Court's

retained jurisdiction over the *Love* Case prohibits the Jemsek Defendants from seeking relief in this Court.

This assertion was first made in response to the Jemsek Defendants' original motion and formal request that this Court allow them to reassert the Enjoined Counterclaims. BCBSNC argues that reimposition of the Enjoined Counterclaims would violate the Florida Court's injunction and impinge upon its retained jurisdiction over the *Love* Case. However, that jurisdiction argument is no longer relevant in this proceeding. In the latest version of that motion, the Jemsek Defendants have abandoned their request for reinstatement. Their Second Amended Motion is limited to seeking sanctions against BCBSNC for its alleged misconduct in the Adversary Proceeding in this Court.

█ There is no doubt that a court has the power to sanction a party in one of its cases for misconduct. *McGahren v. First Citizens Bank & Trust Company (In re Weiss)*, 111 F.3d 1159, 1171 (4th Cir.1997). BCBSNC is the plaintiff/counterclaim defendant in this Adversary Proceeding. As such, this Court may impose appropriate sanctions, if warranted.

### B. BCBSNC's Legal Duties Relating to the Pending Dual Litigation

The Jemsek Defendants maintain that BCBSNC had a legal duty to disclose the *Love* Case and the Settlement, which it repeatedly and intentionally violated. These alleged obligations stem from four sources: (1) the FRBP, applicable to this Adversary Proceeding (e.g., Rule 7026 (Initial Disclosures) and Rule 7033 (Interrogatories)); (2) the procedural rules applicable to MDL (the JPML rules); (3) the Orders and Local Rules of the Florida Court and (4) the parties' general obligations to a court not to misuse the litigation process or to perpetrate a fraud on a tribunal.

There are several theories presented under each source, which the parties explore in great detail in their briefs. Further complicating matters, the theories often overlap and/or feed into one another. For the sake of clarity, each alleged duty will be considered separately. The more discrete (and concrete) theories will be addressed first, then the more intertwined and broader assertions (the debtors' "split claims" and "fraud on the courts" theories) will be considered.

### i. FRBP Rule 7026: Violation of Initial Disclosure Obligations

*Jemsek Defendants' Argument.* The Jemsek Defendants argue BCBSNC violated Bankruptcy Rule 7026 [9] by failing to disclose the *Love* Case and the Settlement in its Initial Disclosures (served April 30, 2007) in this Adversary Proceeding. That rule requires parties to identify, in their initial disclosures, documents and information that the party may use to support its claims or defenses in the action. FRBP 7026(a)(1)(i). Implicitly, the Jemsek Defendants accuse BCBSNC of failing to plead affirmative defenses in its Reply in this Court, but then asserting the same in another court.

---

9. Although BCBSNC indicated that Rule 26 of the Federal Rules of Civil Procedure was made applicable by Federal Rule of Bankruptcy Procedure 7015 (BCBSNC's Br. in Opp'n to Defs.' Mot. (1) For an Order Striking Settlement of Defs.' Countercls.; (2) For an Order Reinstating Defs.' Countercls.' and (3) For Sanctions, Docket No. 151.), Bankruptcy Rule 7015 refers to Amended and Supplemental Procedures, while Bankruptcy Rule 7026 refers to Duty to Disclose; General Provisions Governing Discovery (specifically, initial disclosures).

The Jemsek Defendants point out that after lengthy negotiations, BCBSNC reached the Settlement with the *Love* class plaintiffs on April 27, 2007. However, when BCBSNC filed its Initial Disclosures in this Court three days thereafter (April 30, 2007), it made no mention of the *Love* Case or of the Settlement. Further, BCBSNC supplemented neither its Reply nor Initial Disclosures to disclose this information.

*BCBSNC's Response.* BCBSNC makes two counter arguments to the Jemsek Defendants' Rule 7026 arguments. First, BCBSNC contends that it never asserted the Settlement as a defense to the Enjoined Counterclaims. Rather, BCBSNC insists that dismissal of the Enjoined Counterclaims was occasioned by the Florida Court's Order and not from any defense asserted by BCBSNC in the Adversary Proceeding. According to BCBSNC, since it never intended to use the Settlement as a defense in this Adversary Proceeding, it was not required to disclose the Settlement in either its Reply or its Initial Disclosures.

Second, even if disclosure of the Settlement was required in its Initial Disclosures, BCBSNC argues that on March 8, 2007, when it filed its Reply, the Settlement had not yet been reached, approved or finalized. Consequently, the Settlement could not have been asserted (or conversely waived) in the Adversary Proceeding under principles of *res judicata*.

■ *Discussion.* Rule 7026 of the Bankruptcy Rules requires parties to identify or provide:

a copy—or description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.

Fed.R.Civ.P. 26(a)(1)(A)(ii); F.R.B.P. 7026(a)(1)(A)(ii). Rule 26(e) also requires:

[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response:

(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . .

Fed.R.Civ.P. 26(e)(1)(A).

Further, Rule 8(c) "requires that any matter constituting an affirmative defense be set forth in a defendant's responsive pleading." *Allied Chemical Corp. v. Mackay Farms Ltd.*, 695 F.2d 854, 855 (5th Cir.1983)(citing Fed. R.Civ.P. 8(c)). Failure to comply with Rule 8(c) generally results in a waiver of the defense unless it is raised in the trial court in a "manner that does not result in unfair surprise." *Wilkinson v. U.S.*, 1992 WL 188144, *2 (4th Cir.1992)(citing *Allied Chemical Corp.*, 695 F.2d at 855)(unpublished).

Action should have ceased in this Adversary Proceeding after May 31, 2007, the date the Florida Court entered the preliminary settlement and injunction; however, this will be set-aside until Section iii, below.

Otherwise, this Court finds that BCBSNC was obliged to disclose the *Love* Case and the Settlement in an amendment to its Reply and in its Initial Disclosures filed in this Adversary Proceeding.

While BCBSNC splits hairs between its actions undertaken in this Court and its actions undertaken in the Florida Court, the reality is that the Settlement and its

attendant injunction were obvious potential defenses to the Enjoined Counterclaims in this Adversary Proceeding. The Settlement and injunction became actual defenses when BCBSNC employed them in bar of the Jemsek Defendants' counterclaims in this Court.

BCBSNC clearly asserted the Settlement as a defense to the Counterclaims in its motion to stay the Adversary Proceeding and in the hearing on that motion. On those occasions, BCBSNC argued that the Adversary Proceeding should be stayed because the Jemsek Defendants' Counterclaims had been resolved by the Settlement and enjoined by the Florida Court. When that belated argument received a frosty reception in this forum, BCBSNC turned to the Florida Court and again asserted the Settlement in bar of the Counterclaims. That defense proved successful. BCBSNC obtained injunctive relief from the Florida Court, and the Jemsek Defendants were ordered to dismiss the Enjoined Counterclaims in this Adversary Proceeding.

BCBSNC's use of the Settlement as a defense to the Enjoined Counterclaims obligated it to plead such defense in this Adversary Proceeding and make initial disclosures about the same to the Jemsek Defendants. There is only a question of when, not whether, these disclosures should have been made in the Adversary Proceeding. Obviously, when BCBSNC filed its Reply on April 27, 2007, settlement negotiations in *Love* were well along, and a named, active defendant like BCBSNC must have been aware of them. However, BCBSNC had no present obligation to plead the *Love* Case and Settlement as an affirmative defense to the Jemsek Defendants' counterclaims. In fact, BCBSNC could not have pled the Settlement, as it had not yet been reached.

However, under Rule 26(e), a party has an ongoing duty to amend its pleadings to correct or disclose any incomplete or additional information not otherwise made known to the parties. Fed.R.Civ.P. 26(e)(1)(A). After the Settlement was reached on April 27, 2007, BCBSNC should have amended its pleadings to raise the Settlement in bar of the Jemsek Defendant's counterclaims. It has never done so.

In contrast to the Reply, by the date BCBSNC made its Initial Disclosures (April, 30, 2007), a settlement in *Love* had been reached. BCBSNC asserts that, at this time, it was not conscious of the Settlement and had no intention of ever using *Love* as defense to the Jemsek Defendants' Counterclaims. BCBSNC points out that a party is not obligated under Rule 26 to disclose witnesses or documents that it does not intend to use. *Johnson v. Sakoski*, 2008 WL 53774, at *5 (E.D.Mich.2008).

The Settlement had been entered a mere three days before BCBSNC made its Initial Disclosures. It is likely that BCBSNC's North Carolina counsel was not then aware of the Settlement or its effects on this litigation.

However, there are a couple of problems with this excuse. First, one must distinguish between what was known and intended by BCBSNC, the party, and what was known and intended by Mr. Doherty, its North Carolina counsel. Mr. Doherty advised this Court that he was not aware of the *Love* Case until late March 2008. The Court takes him at his word. Clearly he did not intend to assert the Settlement as a bar to the Jemsek Defendants' Counterclaims before he learned of that settlement.

On the other hand, BCBSNC, the party, was entirely aware of the *Love* Case and, through its other attorneys, negotiated a settlement specifically enjoining class

claims. As both the Florida Court and the Eleventh Circuit ruled, the Jemsek Defendants' Counterclaims clearly fell into this class. Accordingly, while BCBSNC's North Carolina counsel may not have intended to assert *Love* as a defense, even as of April 27, 2007, his client did.

BCBSNC posits that its failure to disclose *Love* or to abide by its litigation injunction was a simple internal communication problem, a case of one hand not knowing what the other was doing. It maintains that it did not realize the Enjoined Counterclaims fell within the Settlement until March 2008. BCBSNC suggests that it took considerable time for it to determine who the putative class members were and to route the Settlement to its other attorneys in the stayed litigation.

There are two problems with this assertion. First, the assertion ignores the fact that the *Love* Case was pending for four (4) years before the Settlement was inked. By the time of the Settlement, BCBSNC should have known which among its existing litigation opponents likely fell within the putative plaintiff class.

Second, even if this information was not immediately conveyed by BCBSNC to attorneys defending its actions in other courts, it soon should have been. As noted, Judge Moreno's May 31, 2007 order enjoined all parties, including BCBSNC, from continuing litigation on the *Love* claims in other forums. As discussed below in Section iii, this injunction should have provoked an immediate detailed review by BCBSNC of the actions falling into the scope of the injunction. There is no definitive moment when BCBSNC's North Carolina counsel should have been aware of the existence of the *Love* Case; however, at that point, absent the injunction, BCBSNC should have amended its Reply and Initial Disclosures to assert the

Settlement as a defense to the Jemsek Defendants Counterclaims.

### ii. FRBP Rule 7033: Violation of Disclosure Obligations in Interrogatories

*Jemsek Defendants' Argument.* The Jemsek Defendants argue BCBSNC committed a second discovery abuse when it failed to disclose the *Love* Case and Settlement in its responses to their interrogatories filed on October 16, 2007. The interrogatory in question states:

> Identify all complaints or lawsuits by any patient or physician against BCBSNC or BCBS Association regarding the **diagnosis, treatment, or coverage** for Lyme disease from January 1, 2000 to the present, and for each communication identify the name of the complainant, the date of the complaint, the substance of the complaint, and the resolution or current status of the complaint.

Defs. Mem. In Supp. Of Their Mot. (1) For An Order Striking Settlement of Jemsek Defs' Countercls.; (2) For An Order Reinstating Defs.' Countercls.; And (3) For Sanctions, Responses, Docket No. 145, Ex. H (emphasis added). BCBSNC's response states:

> BCBSNC has been able to identify only one other instance of a member of physician appeal of denial of coverage for the treatment of Lyme disease by a physician other than Dr. Jemsek or the Jemsek Clinic ... BCBSNC further responds that, to the best of its knowledge and after reasonable inquiry, there are no other complaints regarding the diagnosis, treatment or coverage of Lyme disease since January 1, 2000 ...

*Id.*

The Jemsek Defendants note that the *Love* Case was a coverage dispute brought by all types of physicians. Since the class

necessarily included coverage complaints by Lyme disease doctors, such as the Jemsek Defendants, they argue BCBSNC should have disclosed the *Love* Case in this Interrogatory Response.

*BCBSNC's Response.* BCBSNC argues that the Love action was not responsive to this interrogatory. It contends that the Love class action was not a lawsuit specifically regarding the diagnosis, treatment or coverage for Lyme disease.

 *Discussion.* BCBSNC should have disclosed the Love Case in response to this interrogatory. Federal Rule of Civil Procedure 33 (Interrogatories to Parties) is intended to facilitate trial preparation, to obtain facts, to narrow issues, and to *reduce the chance of surprise. U.S. v. Article of Drug Consisting of 30 Individually Cartoned Jars, More of Less,* 43 F.R.D. 181, 188 (D.Del.1967).

This interrogatory sought identification of coverage complaints against BCBSNC by Lyme disease doctors. The *Love* Case was, in fact, a coverage action where the plaintiff class consisted of a multitude of physicians, physician groups, or physician organizations; one sub-group of such was necessarily those who treated Lyme disease.

Further, BCBSNC is estopped from attempting to re-categorize the *Love* Case or its plaintiff class. In its efforts to force dismissal of these Counterclaims, BCBSNC successfully argued to the Florida Court that the *Love* Case was based on denial of requested payments based on cost rather than medical necessity. Essentially, this was a coverage issue such that the *Love* Case was entirely responsive to this interrogatory. BCBSNC's failure to disclose the *Love* Case in its interrogatory response resulted in the precise outcome that Rule 33 seeks to avoid—ambush by surprise.

BCBSNC served its responses to interrogatories on October 16, 2007, *after* the Love class notice had been mailed out. At this point, six months after the Settlement had been reached, BCBSNC should have been aware of the identity of the claims between the two actions.

Additionally, BCBSNC never amended its discovery responses to correct this non-disclosure. It is undisputable that BCBSNC violated Rule 33 when it failed to identify the *Love* Case in its responses to the Jemsek Defendants' interrogatories.

### iii. Violation of the Florida Court's Injunction

*Jemsek Defendants' Argument.* The Jemsek Defendants next argue that BCBSNC willfully ignored the Florida Court's May 31, 2007 injunction barring the putative plaintiffs and the named *Love* Defendants from continuing litigation pending consideration of the Settlement. Despite that injunction, BCBSNC engaged in extensive and rancorous discovery in this Adversary Proceeding for almost a year without apprising either court or the Jemsek Defendants that these proceedings had been enjoined.

*BCBSNC's Response.* In its briefs, BCBSNC did not address the question of whether it violated the Settlement injunction. Rather, BCBSNC focused on whether these actions were willful, suggesting that the Jemsek Defendants had not proffered evidence that BCBSNC intentionally failed to "tag" the Adversary Proceeding in order to conceal the existence of the *Love* litigation.

 *Discussion.* Clearly, BCBSNC repeatedly violated the Florida Court's injunction by continuing to prosecute this Adversary Proceeding through discovery after May 31, 2007. Specifically, the Or-

der Preliminarily Approving the Proposed Settlement mandates the following:

> All discovery and any other proceedings in the Action against or concerning the Released Parties in the Action, expect with respected to discovery from BCBSA as set forth in Ex. O to the Settlement Agreement, and other than proceedings as may be necessary to carry out the terms and conditions of the Settlement, are hereby stayed and suspended until further order of the Court. Pending final determination of whether the Settlement and the Settlement Agreement should be finally approved and the Class permanently certified, **all putative Class Members and Signatory Medical Societies are hereby barred and enjoined from** commencing or **prosecuting any action asserting any Released Claims, and any other action or proceedings brought by any putative Class members or Signatory Medical Societies asserting any Released Claims are hereby stayed and suspended** until further order of the Court.

Order Preliminarily Approving Proposed Settlement (emphasis added). Mem., Florida Court Docket No. 928 at Ex. G. The Jemsek Defendants were putative class members, BCBSNC was a signatory medical society, and this Adversary Proceeding was an action asserting released medical claims.

#### iv. *Violation of Duty Owed to the Defendants and/or the Courts by Intentionally Prosecuting Split Claims*

*Jemsek Defendant's Argument.* The Jemsek Defendants contend that it should have been clear to BCBSNC from the 2003 genesis of the *Love* Case that the Jemsek Defendants were members of the plaintiff class. If ever in doubt, their status as putative class members was obvious by May 31, 2007, given that by this point: (1)

the Jemsek Defendants had filed their Counterclaims in this Adversary Proceeding and BCBSNC had replied; and (2) the Florida Court had preliminarily approved the Settlement.

At this time, BCBSNC was involved in two simultaneous actions with the same party opponent over what BCBSNC would later successfully contend were the same claims. These "split claims," according to the Jemsek Defendants, gave BCBSNC an affirmative obligation to apprise the affected courts and its opponents of the duality. In support of their proposition, they cite Section 26(1)(a) of the Restatement (Second) of Judgments, *Aguirre v. Albertson's, Inc.,* and another decision by Judge Moreno, *In re Managed Care. Aguirre,* 201 Or.App. 31, 117 P.3d 1012 (2005); In re *Managed Care Litig.,* 236 F.Supp.2d 1336 (S.D.Fla.2002).

Moreover, according to the Jemsek Defendants, BCBSNC was required to raise the split claims "while both proceedings are pending" and *not after* the final settlement approval, as BCBSNC contends. *See Rotec Industries, Inc. v. Mitsubishi Corp.,* 348 F.3d 1116, 1119 (9th Cir.2003) (citations omitted). Thus, BCBSNC's revelation of the dual proceeding, on March 31, 2008, was not timely.

*BCBSNC's Response.* BCBSNC offers several counterarguments. First, BCBSNC says that the *Love* injunction and the Florida Court's retained jurisdiction over the *Love* Case prevents the Jemsek Defendants from obtaining the relief they seek by this motion, i.e. reinstatement of their counterclaims.

Second, BCBSNC states the Jemsek Defendants' alternative relief, sanctions, is not supported by the cases they cite. They contend that these cases relate only to the waiver of an affirmative defense, res judicata, and do not provide for the imposi-

tion of sanctions. BCBSNC's Supp. Brief in Opp'n to Defs.' Mot. for Sanctions, Docket No. 159.

Third, and most significantly, BCBSNC factually denies the Jemsek Defendants' "fraud on the courts" theory. The insurer maintains that, until March 2008, it was unaware that the claims asserted against it in the two courts were identical. Consequently, it did not "hide the ball" from the Jemsek Defendants or the courts in discovery. Nor did it attempt to prevent them from discovering the *Love* action. In point of fact, the Jemsek Defendants were given notice of the Settlement in time to opt out.

Finally, BCBSNC denies any assertions of lassitude and contends its discovery of the split claims was timely. BCBSNC claims that when it recognized the procedural problem, it acted promptly to apprise the two courts of the relationship between the claims and assert the *Love* injunction to arrest further proceedings on the Enjoined Counterclaims.

■ *Discussion.* An evaluation of these arguments requires a review of how BCBSNC's position on whether the Jemsek Defendants' claims were identical to those in the *Love* Case morphed over time in the two actions.

From the genesis of these two actions in 2003/2007 through March 2008, it was BCBSNC's position, expressed by its conduct if not its word, that the Jemsek Defendants' counterclaims were not identical to those asserted in *Love.* As noted elsewhere, on several occasions in one court or the other, it was incumbent upon BCBSNC to disclose the relationship between the claims arising in the two actions. Despite these duties to speak, BCBSNC

said nothing and acted as if there was no such identity. These nondisclosures included failing to associate the dual claims in its Reply, Initial Disclosures, and interrogatory responses in this Court.

Then, after the class opt-out deadline passed, in March 2008 BCBSNC inexplicably saw the previously overlooked connection between the claims. Only then did it bring the *Love* action and, more importantly, its injunction to the attention of the two courts.

At this point, BCBSNC's position changed. With the opportunity to block the Jemsek Defendants' Counterclaims with the class injunction, BCBSNC argued to the courts that the Love class claims were clearly and inescapably identical to those being asserted in this Court. The Jemsek Defendants had no choice but to contend otherwise and battled BCBSNC over this point in the Florida Court and at the Eleventh Circuit.

However, the claims were factually and legally identical. The Florida Court, and then the Eleventh Circuit, concluded that the Enjoined Counterclaims were subject to the Settlement and injunction. Accordingly, the Florida Court required the Jemsek Defendants to withdraw these claims in this Adversary Proceeding with prejudice.

Faced with the loss of most of their counterclaims but still having to defend against BCBSNC's primary claims, in the first version of this motion, the Jemsek Defendants asked this Court to reinstate the Enjoined Counterclaims based upon the well-established "waiver by acquiescence" rule. *See* Mem. of Law, Docket No. 145.[10] In short, the original motion

---

10. Under the "waiver by acquiescence" rule, a party who has simultaneously maintained separate actions based upon parts of the same

claim, but has failed in either to object to the dual proceedings, is not entitled to a res judicata effect from the resolution of one action

argued that since BCBSNC had knowingly allowed the simultaneous prosecution of these counterclaims in two courts, it had waived any res judicata effect arising from the Settlement.

While the Jemsek Defendants' request was well reasoned, this was not just a case of res judicata. Rather, the Florida Court had affirmatively enjoined the class members from prosecuting their claims in other courts. Judge Moreno reaffirmed that injunction after BCBSNC brought the matter to his attention, ordering the Jemsek Defendants to dismiss the Enjoined Counterclaims.

As exemplified by this case, there are practical problems associated with having an outside court directing a debtor's actions within its bankruptcy case.[11] However, that decision was legally sound, affirmed on appeal, and in keeping with Fourth Circuit precedent. This Court will not attempt to disturb or sidestep that injunction.

Even so, it must be recognized that BCBSNC successfully adopted contrary positions in two different courts, and obtained substantial benefits in each. It now reverses course once more to argue in this Court that it could not have reasonably discerned in the pendency of this Adversary Proceeding that the Jemsek Defendants' counterclaims were substantially identical to those in *Love*. Apparently, under BCBSNC's most recent view of the matter, the claims still were not similar enough for it, even in the exercise of caution, to warn the two courts, or its opponents, of the potential for split claims.

■ Clearly, the judicial estoppel doctrine controls. That doctrine precludes a party from adopting one position in one court in order to obtain relief, and then taking an opposite position in another court. *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (citing 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p. 782 (1981) ("absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory")).

The *Love* Court and the Eleventh Circuit are certainly well versed in Rule 23 and know how to discern when a claim falls within the parameters of a class. Both courts easily identified the Enjoined Counterclaims as identical to those asserted in *Love*. Given this clarity, and in

as against a trial in the second. Section 26(1)(a) of the Restatement (Second) of Judgments.

11. Like the Rule 23 scheme for class actions, the Bankruptcy Code directs multiple parties with claims against a debtor into one forum and centralizes control over that marshalling process in that court. Because each body of law, Rule 23 and the Code, centralizes control over a multiplicity of claims in a given court, there can be tension between the two schemes where one is both debtor in one court and party to a class action in another court. As interpreted, the class rules permit an outside court to first settle and then direct a debtor to dismiss with prejudice "core" bankruptcy estate claims pending in the bankruptcy court

(See 28 U.S.C. § 157(b)(2)(C): counterclaims by the estate against persons filing claims against the estate). This is a bit at odds with the bankruptcy scheme. For example, had these two acts been attempted by either party within the Adversary Proceeding, they would have required prior notice to creditors and court approval in order to be effective.

Even so, both the Eleventh Circuit in *Love*, and the Fourth Circuit in *Marino v. Pioneer Edsel Sales, Inc.*, have struck the balance in this area in favor of enforcement of class action settlements. 349 F.3d 746, 749–54(4th Cir.2003)(the court administering the class action has exclusive jurisdiction to resolve questions of interpretation of the settlement agreement).

keeping with collateral estoppel principles, this Court will make the same assumption.

The Settlement was reached and submitted to Judge Moreno for preliminary approval on April 27, 2007. From that date forward, BCBSNC was aware, or should have been aware, that it and the Jemsek Defendants were (1) engaged in split claims litigation and (2) were enjoined from undertaking further litigation in this Adversary Proceeding. Accordingly, this Court rejects BCBSNC's contention that its silence and continued litigation in this forum was the product of inadvertence.

■ As the Jemsek Defendants point out, a party with knowledge of split claim litigation may not remain silent. Rather, it is required to promptly raise the splitting of the claim "while both proceedings are pending." See *Rotec,* 348 F.3d at 1119 (citations omitted). Application of the split claims doctrine is aptly demonstrated by the case of *Aguirre.* 117 P.3d at 1012.

Aguirre was originally employed by Albertson's grocery stores. Her employment was terminated. Afterward, Aguirre filed an action in state court against Albertson's. Two of Aguirre's claims were based on her former employer's failure to pay her overtime wages. One claim arose under state law; the other was based on federal law. *Aguirre,* 117 P.3d at 1014.

After receiving the complaint, Albertson's removed the case to U.S. District Court in Oregon, and filed an answer. *Id.* In response, Aguirre voluntarily dismissed her federal claim with prejudice and asked the U.S. District Court to remand the case. *Id.* Albertson's did not object and the case was remanded to Oregon Circuit Court. *Id.* Within days, Aguirre filed an amended complaint in the state proceeding. *Id.* Albertson's filed an answer, and discovery commenced. *Id.* Eventually the Oregon Circuit Court transferred the case to arbitration. *Id.*

Throughout that time period, and unbeknownst to Aguirre, a putative MDL class action lawsuit against Albertson's was pending in U.S. District Court in Idaho. *Id.* Multiple actions brought against Albertson's were consolidated and transferred to the Idaho federal Court pursuant to the rules for MDL. *Id.* The Idaho MDL case was essentially identical to the Oregon action in that it involved federal wage claims and state law wage claims for off-the-clock work. *Id.* at 1014–15.

During the period in which Aguirre's case was moving between state court and federal court in Oregon, Albertson's and the named plaintiffs in the Idaho MDL class action reached a settlement. *Id.* at 1015. However, even after entering into a settlement agreement, Albertson's failed to notify the two courts or the JPML of the pendency or existence of the Oregon action. *Id.*

Aguirre herself received only the most limited notice of the Idaho class litigation. After the Idaho Court preliminarily approved the settlement agreement, notices were sent to all potential class members informing them of their respective procedural rights and obligations relating to opting out of the MDL. *Id.* A notice was mailed to Aguirre; however, it went to her old address. She remained unaware of the Idaho MDL action and of the class settlement. *Id.* at 1016. The class opt-out deadline passed without Aguirre being aware that she was a putative member of the class action. *Id.*

Meanwhile, the Oregon litigation continued unabated with Alberston's remaining silent. Only after the Idaho "opt out" period expired did Albertson's disclose the dual litigation. With the class settlement finalized, Albertson's then asked the Oregon Circuit Court to dismiss Aguirre's action. It argued that Aguirre's claims were

barred by the Idaho Court's final judgment approving and incorporating the multi-district settlement. *Id.*

The state court arbitrator denied Albertson's motion to dismiss. *Id.* The arbitrator cited the following reasons:

- Plaintiff made discovery requests to Albertson's that, had Albertson's complied with them, would have resulted in disclosure of the existence of the complaint in the MDL action;
- Albertson's responded untruthfully to plaintiff's discovery requests by stating that plaintiff's request sought "information concerning issues other than those involved in [plaintiff's state court] litigation";
- Albertson's should have produced the MDL complaint for plaintiff;
- If plaintiff had been aware of the MDL action, she would have opted out of the Rule 23 class because the settlement agreement gave her no relief on her state wage claim;
- Albertson's argument that it had no way of knowing whether plaintiff would opt out of the MDL action was "disingenuous under the circumstances";
- Albertson's conduct was inequitable and resulted in plaintiff's failure to and resulted in plaintiff's failure to opt out within the deadline.

*Id.* at 1016–17 (footnote omitted).

The Oregon Circuit Court rejected the arbitrator's decision, granting summary judgment in favor of Albertson's. *Id.* at 1027. However, the Oregon Court of Appeals then reversed the circuit court, restoring Aguirre's suit, despite the fact that the state court action arose out of the same claim as the one before the MDL.

The Court of Appeals acknowledged that "claim preclusion applies to an action brought by persons who were parties to a prior class action only because they failed to opt out of the class." *Id.* at 1022. Further, the "fact that the MDL judgment was based on the parties' settlement rather than a full adjudication of the merits [was] of no moment." *Id.*

Nevertheless, the *Aguirre* Court held that Albertson's had waived the MDL release, because it "knew from day one in this case that this action and the MDL act were simultaneously pending," and yet "actively defended both actions for more than a year." *Id.* at 1026.

The nefarious nature of Albertson's actions and the Court's condemnation of the same were clearly stated:

> Rather than do anything that would alert plaintiff to the pending MDL action, Albertson's silently defended this action for more than a year. In particular, Albertson's declined to move to dismiss this action, as it could have done, or to alert the federal tribunal to its pendency, as it should have done, either of which would have aided in registering Albertson's objection to having to defend both actions simultaneously. Instead, Albertson's bypassed those remedies and defended this case as though it should proceed independently and separately. It did so, patently, for tactical advantage. To borrow from the Ninth Circuit's admonition, to permit a defendant to engage in such conduct can "only encourage mischief." *Rotec Industries, Inc.,* 348 F.3d at 1119. Here, mischief appears to abound.

*Id.* at 1027.

In addition to the Oregon Court of Appeals in *Aguirre,* two federal circuit courts of appeals have also decried the split claims tactic. Both the Ninth Circuit in *Rotec* (cited above) and the Fifth Circuit have held in similar circumstances that a rule "imposing res judicata despite a defendant's agreement or acquiescence in

splitting of the claim, would encourage litigants to engage in dishonest (or at least less than forthright) behavior to gain tactical advantage." *Matter of Super Van Inc.,* 92 F.3d 366, 371 (5th Cir.1996).

Obviously, the *Aguirre* case and the current matter involve nearly identical facts and the same body of federal law regarding claim preclusion. Consequently, BCBSNC was wrong to continue to litigate the split claims in two courts without disclosure, only to later strategically raise the arguments to block its opponents' claims.

 As BCBSNC points out, the aforementioned authorities are res judicata cases. The current motion seeks sanctions, not disregard of the res judicata effect of the Settlement. However, boiled down, the split claims theory is founded upon the premise that a party shall not mislead a court, needlessly multiply causes of action or forum shop. *Phillips/May Corporation v. U.S.,* 524 F.3d 1264, 1270 (C.A.Fed.2008) (citing 124 Cong. Rec. S36267 (daily ed. Oct. 12, 1978)). And if intentionally wrought, prosecuting split claims is a fraud upon the affected courts, as exemplified by Judge Moreno's decision in another Managed Care dispute. *In re Managed Care Litig.,* 236 F.Supp.2d 1336 (S.D.Fla.2002).

*In re Managed Care Litig.,* a suit arising from the same MDL case as *Love,* involved another litigant, CIGNA, who litigated one class action in one court while surreptitiously pursuing a second suit in another. Again, this was done without informing the Clerk of the MDL Panel, or either judge, of the existence of the potential tag-along suits. *Id.* However, once the class action had arrived at settlement, CIGNA attempted to use that settlement to preclude the claims in the other pending actions.

Judge Moreno considered CIGNA's endeavors to be reprehensible. He declared that defendant CIGNA "snookered both this Court and Judge Murphy in Illinois in an obvious attempt to avoid this Court's jurisdiction" by proceeding with these simultaneous split claims and violating MDL Rule 7.5(e) (discussed below).[12]

As the aforementioned cases illustrate, a party's failure to apprise its opponent and the affected courts of split claims is sanctionable conduct. When that failure is intentional, it is tantamount to fraud on a tribunal. *Id.*

### v. Violation of JPML Rules 5.2 and 7.5(d)-(e)

*Jemsek Defendants' Argument.* The Jemsek Defendants also accuse BCBSNC of willfully violating an affirmative obligation to apprise the two Courts and the MDL Panel of the existence of this Adversary Proceeding under the rules applicable to MDL. The *Love* Case was part of a broader MDL case, *In re Managed Care,* also being handled by the Judge Moreno. According to the Jemsek Defendants, upon removal of this Adversary Proceeding from state court in January 2007, BCBSNC and its counsel were required by JPML Rule 7.5(e) to notify the Clerk of the JPML. Additionally, BCBSNC, as a named defendant in a tag-along action,[13] was required to provide prompt notice of this fact to its party opponents under JPML Rule 5.2(a) and to the two Courts

---

**12.** The Court reserved the matter of sanctions for a later time. *In re Managed Care,* 236 F.Supp.2d 1336, fn. 6.

**13.** *Donald S. Horner, M.D., et al. v. Blue Cross Blue Shield of North Carolina,* No. 5:04–cv– 00081–FL (E.D.N.C.) and *North Carolina Medical Society v. Blue Cross Blue Shield of North Carolina,* No. 5:04–cv–00113–FL (E.D.N.C.): cases deemed tagalongs to the *In re Managed Care.*

under JPML R. 5.2(b). The Jemsek Defendants maintain that BCBSNC's failures to provide the notice were intentional acts designed to gain a strategic advantage.

*BCBSNC's Response.* First, BCBSNC denies that this Adversary Proceeding is a potential tag-along to the MDL case and thus claims that disclosure of the same was not required. Even if disclosure was required, BCBSNC argues, MDL class members are not entitled to any additional notice (or any different notice) than class members in any other class action. Thus, BCBSNC argues that the *Love* Case's MDL status is irrelevant to whether the Jemsek Defendants had sufficient notice of the settlement.

Second, BCBSNC proposes that, even if these were taggable cases, its failure to disclose the Adversary Proceeding occasioned no harm because: 1) this Adversary Proceeding could not be tagged to the MDL until the Jemsek Defendants removed the case to federal court in January 2007, and 2) the class notice was given within a reasonable amount of time thereafter (only six months) in July 2007.

██ *Discussion.* JPML Rule 7.5(e) creates an affirmative duty for "[a]ny party or counsel in actions previously transferred under Section 1407 or under consideration by the Panel for transfer under Section 1407" to "promptly notify the Clerk of the Panel of any potential 'tag-along actions' in which that party is also named or in which that counsel appears." Supp. Br., Docket No. 159 at 3 (quoting JPML Rule 7.5(e)). JPML Rule 1.1 defines a potential tag-along action as "a civil action pending in a district court and involving common questions of fact with actions previously transferred under Section 1407." JPML R. 1.1.

BCBSNC argues that the *Love* Case was a class action originating in the Southern District of Florida. According to BCBSNC, *Love* was not "multidistrict litigation" and the case "was ineligible for transfer under § 1407." Supp. Br., Docket No. 159 at 3. Consequently, it contends, the JPML Rules do not apply to *Love,* and no disclosure was required. See *id.* There are a couple flaws with this argument.

First, any difference between *Love* and *Managed Care* for MDL rules purposes is a distinction only recently made by BCBSNC. Previously in this action, BCBSNC has referred to the *Love* Case as a multidistrict case. *See Am. Mot. for Amendment of Stay Order,* Docket No. 84. Even as BCBSNC was demanding that the Adversary Proceeding be stayed due to the Settlement, it referred to that case as "the *multidistrict class action litigation* captioned *Rick Love, M.D., et al. v. Blue Cross and Blue Shield Association, et al.* (formerly *Thomas, et al. v. Blue Cross and Blue Shield Association, et al.*), Case No. 1:03–cv–21296–FAM, pending in the United States District Court for the Southern District of Florida." *Id.*[14]

Second, even if *Love* was not an MDL case, as the Jemsek Defendants' now contend, its sister case, *In Re Managed Care,*[15] was an MDL case. If not *Love, In*

---

14. The purpose of the MDL rule is to avoid duplicitous litigation in multiple courts. *An Overview of the U.S. JPML,* U.S. JPML, *http://www.jpml.uscourts.gov/General_Info/Overview/overview.html.* ("The purposes of this transfer or "centralization" process are to avoid duplication of discovery, to prevent inconsistent pretrial rulings, and to conserve the resources of the parties, their counsel and the judiciary."). Given the close nexus between *Love* and the broader Florida class action, if there was any question whether *Love* was subject to the MDL rules, BCBSNC should have struck the balance in favor of over-disclosure.

15. *Love* was a subset of the larger *Managed Care* litigation. Both cases were pending be-

*Re Managed Care* created a duty for BCBSNC to notify the two courts and the JPML Panel of the dual litigation.

Under JPML Rule 7.5, BCBSNC had a duty to promptly notify the JPML Panel of the competing litigation in North Carolina and to provide notice to the Jemsek Defendants and to the two courts. Since the *Managed Care* and *Love* cases were already underway when this was pending, at the latest, this disclosure duty arose when the Jemsek Defendants filed their Counterclaims in the Adversary Proceeding in March 2007. Despite this duty, to date, BCBSNC has still not complied with Rule 7.5(e).

### vi. Violation of the Florida Court's Local Rules

██ By arguing that *Love* was a "stand alone" class action, to which the MDL rules did not apply, BCBSNC has posited that it was only subject to the Southern District of Florida's Local Rule 3.9. Supp. Br., Docket No. 159 at 4. This Court concludes otherwise. However, even if BCBSNC is correct, it is hard to fathom how this assertion would improve the insurer's position. Local Rule 3.9 provides that:

> [i]t shall be the continuing duty of the Clerk and of the attorneys of record in every action or proceeding to bring promptly to the attention of the Court and opposing counsel the existence of [similar pending actions or proceedings . . . ], as well as the existence of any similar actions or proceedings then pending before another court or administrative agency.

S.D.Fla. Local Rule 3.9(D). (Emphasis added.)

By its terms, Local Rule 3.9 creates broader affirmative duties than those pro-

vided for under the JPML Rules. Although this Adversary Proceeding was clearly similar to that Court's *Love* and *Managed Care* cases, before March 2008 neither BCBSNC nor its counsel brought this case to the attention of the Florida Court or the Jemsek Defendants' attorneys. Prompt reaction on their part would have made this information known at the date the Settlement was reached, or shortly thereafter, but certainly well before March 31, 2008. Alerting the two courts six months after the class notice was mailed was not "prompt" under the circumstances.

Accordingly, regardless of which rule is applicable, BCBSNC has shirked its legal obligations, either pursuant to JPML Rule 7.5(e) relating to *Managed Care/Love* or by disregarding an even more expansive continuing duty under S.D. Fl. Local Rule 3.9.

### vii. Relationship Between the Class Notice and the Notices Required under JPML Rules 7.5(d)-(e) and the Florida Court's Local Rules

██ BCBSNC further attempts to avoid responsibility for its nondisclosures by arguing that the Jemsek Defendants are trying to create an additional notice requirement beyond the Rule 23 class action requirements. Supp. Br., Docket No. 159 at 7. The insurer suggests that the Jemsek Defendants are really attempting to reargue the *Love* Case. BCBSNC repeatedly points to the Florida Court and the Eleventh Circuit's finding that the Jemsek Defendants received the class action notice due them.

As discussed supra, the Jemsek Defendants now acknowledge the efficacy of the *Love* class notice and that this is not pres-

fore Judge Moreno during the relevant peri- ods of time.

ently an issue in this motion. *See* Mem. in Supp. of Mot., Docket No. 145 at 5.

However, the current matter is not relitigation of the *Love* injunctive proceedings. This dispute involves three basic questions:

1) Did BCBSNC have legal duties to disclose the existence of the two proceedings to their opponents and the courts?

2) If so, did BCBSNC breach any of those duties? and

3) If so, were those breaches intentional efforts to mislead the courts or the Jemsek Defendants?

The first two questions have been answered affirmatively above, but not based on class action law. BCBSNC's obligations to plead its defenses, make discovery, and inform the courts and its opponents of split claims are separate and distinct legal duties from those arising under Rule 23.

The same is true with the MDL rules. Membership in a plaintiff class is irrelevant to notification pursuant to JPML Rule 7.5(e). Notice under Rule 23(c)(2) is contingent upon class membership. The point of JPML Rule 7.5(e) is: a) to ensure that judicial resources are not squandered, as here, on frivolous litigation designed to "hide the ball" from an ongoing MDL, and b) to ensure that litigants do not unintentionally split their claims. Neither of these goals are met through a generic Rule 23(c)(2) notice; nor were they sufficient in the Adversary Proceeding to notify Defendants' counsel, the JPML Panel, this Court, or by extension, the body of creditors, of the existence of a potentially devastating simultaneous action.

The fact that the notice obligations under Rule 7.5(e) exist separate and apart from those arising under Rule 23(c)(2) is

exemplified by the *Managed Care* and *Aguirre* cases previously discussed.

In *Managed Care,* CIGNA had also complied with the notices required by Rule 23. However, Judge Moreno pointed out that CIGNA was guilty of both dishonesty to the courts and a violation of Rule 7.5(e): "[m]ultidistrict litigation is also subject to a special set of Rules of Procedure," the JPML Rules. *In Re Managed Care Litig.,* 236 F.Supp.2d 1336, 1337 (S.D.Fla. 2002).

Judge Moreno further noted that:

CIGNA is in violation of MDL Rule 7.5(e) which has been attached to various orders of this Court and each and every JPML order transferring and consolidating cases with MDL 1334[. . . .]

*Id.* at fn. 6 (emphasis in original).

The distinction between Rule 23(c)(2) and JPML Rule 7.5(e) is also pointed out by the findings in *Aguirre.* 117 P.3d 1012. In *Aguirre,* the plaintiff attempted to attack the class judgment because she had not received individual Rule 23(c)(2) notice, given her change of address. Supp. Br., Docket No. 159 at 7, fn. 2. The Oregon Court of Appeals dismissed that argument based on Rule 23(c)(2). The class rules had been observed such that Aguirre could not avoid the preclusive effect of the judgment. *Aguirre,* 117 P.3d 1012, fn. 12.

Despite finding that the Albertson's had met their legal obligations under Rule 23(c)(2) the appellate court found in favor of Aguirre. In so ruling, the *Aguirre* court considered the fact that the defendants had shirked their legal obligations under JPML Rule 7.5(e). *Id.* at fn. 25.

These two decisions clearly dispel any notion that the MDL notice issue was settled by Judge Moreno's finding that

BCBSNC met its legal and constitutional obligations under Rule 23(c)(2).[16]

BCBSNC asserts that the claims in *Doctors Health* are substantially similar to those of the Jemsek Defendants here and, therefore, that the results should be substantially similar as well—a complete release with no sanctions following. Supp. Br., Docket No. 159 at 2–3. BCBSNC's reliance on *Doctors Health, Inc. v. NYL-Care Health Plans of the Mid-Atlantic, Inc.* is misplaced. Apart from being unpublished, *Doctors Health* does not involve the issue of sanctions. *In re Doctors Health, Inc.*, No. L–05–01493 at 8 (D.Md. 2008). Further, that case is in a different procedural posture than the instant case, thereby rendering any further analogy[17] unpersuasive. *See id.*

Here, the Jemsek Defendants seek sanctions for BCBSNC's multiple abuses of the discovery process and violations of the applicable Federal Rules of Civil Procedure and JPML Rules. The *Doctors Health* opinion does not refer to sanctions but rather addresses the issue of whether the settlement approved in the *In Re Managed Care* litigation applied to Doctors Health's claims against Aetna. *In Re Managed Care*, 298 F.Supp.2d 1259 (S.D.Fla.2003). The Maryland District Court held that it did and, consequently, reversed the Bankruptcy Court's injunction prohibiting Aetna from pursuing contempt charges against Doctor's Health in Florida. The Court also stayed an appeal of the Bankruptcy Court's ruling. *In re Doctors Health, Inc.*, No. L–05–01493 at 18–19.

By contrast, the Jemsek Defendants are not directly or indirectly challenging the Settlement in the *Love* Case.[18] This motion is not about whether the Enjoined Counterclaims should have been lost as a result of the Settlement; it is whether BCBSNC should be sanctioned for its failure to apprise the courts of the connection between this Adversary Proceeding and the *Love* Case.

**16.** This would be true even if, in addition to generic Rule 23(c)(2) notice, BCBSNC had provided actual notice to the Jemsek Defendants' counsel. In *Power Travel International, Inc. v. American Airlines, Inc.*, No. 02 Civ 7434 RWS, 2004 WL 2428714 (S.D.N.Y. Oct 29, 2004), the court found that the "failure on the part of the defendants in *In re Travel Agent Commission Antitrust Litigation*, including Defendants in this action, to notify the MDL Panel of the pendency of the Power Travel action indicates that Defendants sought to treat this action as a separate matter," even after Defendants expressly raised the prospect of *res judicata* directly to opposing counsel while both actions were pending. *Id.* at *8.

**17.** In *Doctors Health*, there was a confirmed liquidation plan that provided for distribution of at least $4.7 million to creditors. *In re Doctors Health, Inc.*, 335 B.R. 95, 101 (Bankr. D.Md.2005). That plan disclosed to creditors that disallowance of the NYLCare claim would have resulted in a larger distribution; however, creditors stood to receive some distribution even if that claim was allowed. *See* Emer. Mot. of Doctors Health, Inc. (I) to Enforce the Plan and Confirmation Order, (II) Enjoin NYLCare Health Plans of the Mid-Atlantic, Inc., Aetna, Inc., and Aetna U.S. Healthcare, Inc. from Collateral Attack on the Plan, Confirmation Order and Adversary Proceeding Judgment of this Court and (III) Hold the Foregoing Parties in Contempt for Violation of the Plan and Confirmation Order, Ex. 1, Pt 2 at 12–13 (D.E. 718), (Bankr. D. Md., Case No. 98–66211).

**18.** The same can be said for BCBSNC's citation to *Santangelo v. Fairbanks Capital Corp. (In re Santangelo)*, 325 B.R. 874 (Bankr. M.D.Fla.2005). Supp. Br. at 13. Not only is that chapter 13 case wholly inapplicable to the facts presented here, the issue decided therein was whether a class action settlement applied, not whether the litigant who was aware of that settlement should be sanctioned for any dilatory behavior in failing to notify the bankruptcy court of that settlement as is the case here. *See* 325 B.R. 874.

As previously noted, in *Doctor's Health*, the Maryland District Court did not have the question of sanctions before it, but only whether a class settlement could bar a debtor's claims. With the Maryland District Court's holding that the settlement could do so, the action moved to Florida. In an order entered on January 22, 2009, Judge Moreno held that the claims that Doctors Health had against Aetna had been settled. *In re Managed Care*, Master File No. 00–1334–MD–Moreno (S.D. Fla. Jan. 22, 2009).

Apart from these distinctions, it should be noted that the Eleventh Circuit Court of Appeals recently reversed the Doctor's Health decision, holding that the debtor's claims against Aetna were not affected by the class settlement. *In Re Managed Care Litigation*, 605 F.3d 1146 (11th Cir. 2010). That reversal may still lead to sanctions being imposed in bankruptcy court against Aetna.

The *Doctors Health* Bankruptcy Court took under advisement the question of whether Aetna or its attorneys should be held in contempt or subject to sanctions for "outrageous and unwarranted" failure to inform the Bankruptcy Court and the Maryland District Court [19] of "any assertion" that the claims of Doctor's Health had been barred by the class action settlement. Md. B.R. Docket, Order, Ex. F at 8–9.

Due to the Maryland District Court's stay, no further proceedings have been held in this regard. However, both Maryland courts faulted Aetna for its inaction. As the District Court noted, "[s]ignificantly, Aetna did not notify the bankruptcy court of the Class Action litigation or the settlement agreement." *Doctors Health*, No. L–05–01493 at 9. Further, in a footnote, Judge Legg noted that by timely notification Aetna could have stayed the need to resolve claims that may have been released, and undoubtedly would have avoided an "unseemly war between two federal courts." *Id.* at 16, fn. 20 (quoting *In re Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969, 975 (N.D.Ill.1992)) (emphasis added). The *Doctors Health* Court went no further in discussing Aetna's behavior, as the question of sanctions was not before it.

In short, the *In Re Managed Care* settlement did not preclude the Maryland Bankruptcy Court from imposing sanctions against Aetna, and the decision of Doctor's Health does not foreclose sanctions under these circumstances.

## C. BCBSNC's Intent

The next question presented is whether BCBSNC purposefully failed to make the aforementioned disclosures. The Jemsek Defendants contend BCBSNC was well aware of the dual litigation and purposely set out to conceal this information from its opponents, the courts, and the Panel in order to gain procedural advantage. The Jemsek Defendants note that by failing to apprise the courts, BCBSNC was ultimately able to settle these claims in Florida on advantageous terms. BCBSNC of course denies this allegation. BCBSNC's Br. in Opp'n to Def.'s Mot, Docket No. 151 at 30. Apart from the parties' assertions, the evidence regarding BCBSNC's state of mind is largely circumstantial and based on BCBSNC's actions (or inactions) in the two causes.

Again, from the genesis of the Adversary Proceeding in January 2007 until March 31, 2008, BCBSNC acted as if the Jemsek Defendants' counterclaims were unrelated to the claims asserted against it

---

**19.** Aetna had submitted an appeal to the U.S. District Court in Maryland before it alleged that Doctor's Health's claims had been settled.

in the *Love* Case (which originated in 2003). On multiple occasions, when it was incumbent upon BCBSNC to disclose the relationship between the two actions, it remained silent. BCBSNC failed to: 1) disclose the connection in its Reply; 2) disclose the connection in its Initial Disclosures, 3) disclose the connection in its interrogatory responses; 4) tag this Adversary Proceeding with the JPML; 5) disclose the existence of the Adversary Proceeding to the Florida Court in *Love;* and 6) disclose the existence of *Love* to this Court.

Further, BCBSNC systematically ignored the Florida Court's injunction. It made no mention of the same to its opponents or this court and, for more than nine months after the *Love* litigation was settled and enjoined, BCBSNC continued to vigorously litigate the same claims in this Court.

Then, on March 31, 2008 and at a most fortuitous point in time, BCBSNC inexplicably made the connection between the two actions. BCBSNC's epiphany occurred after the *Love* class "opt out" period passed and just after a significant discovery battle was lost by BCBSNC in the Adversary Proceeding. BCBSNC does not explain why this relationship between the cases became obvious to it at this point, when, despite the aforementioned legal requirements to search its records, it previously was not.

Given this factual backdrop, there appear to be only two reasonable explanations for BCBSNC's nondisclosures: either 1) BCBSNC was aware of the relationship between this Adversary Proceeding and the *Love* action and purposely chose to remain silent, or 2) it was recklessly indifferent to its legal responsibilities and on several occasions failed to search its records.

It appears on this record that it is the former—BCBSNC purposely withheld this information. However, it hardly matters in that the second conclusion is almost as damning as the first. Under either alternative, BCBSNC's conduct is sanctionable.

### D. Harm Occasioned

Finally, it is necessary to address the considerable harm occasioned by BCBSNC's multiple failures to disclose the existence of these dual actions. First, BCBSNC maintained its silence until after the Florida class action was settled, the opportunity to opt out of the Settlement expired, and the Jemsek Defendants were unable to participate in the class settlement negotiations. As to the courts, BCBSNC showed utter disregard for numerous rules and orders, including the discovery rules, the Federal Rules of Procedure, the JPML Rules of Procedure, the Local Rules of the Florida Court, and the *Love* injunction.

Due to BCBSNC's failure to abide by these rules and orders, the two courts, the Panel, and the Jemsek Defendants (and most importantly their attorneys) remained unaware of the dual proceedings. As a proximate result, the Jemsek Defendants and their creditors lost all but two of the counterclaims—counterclaims asserted to have an aggregate value exceeding twenty million dollars. *Supra,* fn. 4. Meanwhile, the Jemsek Defendants were forced to needlessly expend hundreds of thousands of dollars, first in litigating the Counterclaims and then, after the belated disclosure of the Settlement, in defending the Enjoined Counterclaims in two different federal judicial districts and in a circuit appeal. These fees further deplete the bankruptcy estates and come at the expense not only of the Jemsek Defendants, but their creditors as well.

Finally, in addition to being "snookered" by BCBSNC, these actions have caused the federal courts to waste a tremendous amount of judicial resources as BCBSNC attempted to jurisdictionally pit them against one another.

### i. Effect of the Class Notice

In a last gasp effort to avoid responsibility for its actions (or inactions), BCBSNC argues that any damage to the Jemsek Defendants and their creditors was due to its opponents' lassitude rather than its own misconduct. BCBSNC again resorts to its class notice argument, contending that, because the Jemsek Defendants received legally sufficient notice of the Settlement, any loss of their counterclaims was due to their inaction.

As an initial point of fact, BCBSNC's disclosure duties were owed not just to the Jemsek Defendants, but also to the two courts. Indisputably, BCBSNC did not give notice of the Settlement to this bankruptcy court until March 2008. That class notice certainly did not obviate BCBSNC's duties to this court under the aforementioned authorities.[20]

As to the Jemsek Defendants, it has been previously noted in Section vii, *supra*, that, while the class notice may have been legally sufficient under Rule 23, it did not serve as substitute for the other disclosures required of BCBSNC. Those conclusions need not be repeated. Given this fact, BCBSNC's current argument, at most, amounts to a laches assertion: the Jemsek Defendants knew about the Settlement and its future effects on this Adversary Proceeding. By not reacting, they slept on their rights.

However, this record does not support a finding that the Jemsek Defendants were aware of the connection or of these effects. The opposite is the case. The Jemsek Defendants' received the notice but appear not to have appreciated its meaning to this case. This conclusion is supported by the fact that the Jemsek Defendants did not even apprise their attorneys of the notice. Like the courts, the Jemsek Defendants' attorneys would only learn of the class notice when BCBSNC made its surprise announcement in late March 2008.

As a practical matter, the Jemsek Defendants were unlikely to recognize the Settlement notice's potential effects on this Adversary Proceeding. The notice neither mentioned this proceeding nor advised that the litigation had been enjoined. The Jemsek Defendants are not attorneys.

What little the Jemsek Defendants knew about bankruptcy law would have suggested that *Love* would have no effect at all on the Adversary Proceeding. Two well-known aspects of bankruptcy law are the "automatic stay" and bankruptcy court supervision of a debtor's legal and financial affairs. Under Section 362, a bankruptcy filing stays all creditor collection activities. Such efforts must be addressed to the bankruptcy court in which the debtor's case is pending. 11 U.S.C. § 362(a). Similarly, with few exceptions, control over a debtor's property and affairs is exercised by the bankruptcy court.[21] These two as-

---

20. Further, weighing against this equitable defense, the harm occasioned by BCBSNC extended to other creditors for whom the Counterclaims represent the only viable source of payment and whose claims are subordinate in priority to the weighty attorneys fees run up in this action. These creditors received absolutely no notice of the Settle-ment and, like the Court, were entirely unaware of the class action.

21. These tenets are integral to the bankruptcy system in that they balance a creditor's rights against those of other creditors and enable the court to marshal a debtor's scarce assets amid competing creditor claims.

pects of bankruptcy are routinely impressed upon prospective debtors by their attorneys. No doubt, the Jemsek Defendants were aware of these principles and believed them to be applicable to their cases.

Even to bankruptcy attorneys, it would come as a shock that an oblique class notice from another court could strip a debtor of his pending claims in a "core" proceeding before the "home" bankruptcy court. We now know that is the case, but there is no reason to think the Jemsek Defendants would have realized that at the time they received the class notice.

Finally, there is the matter of BCBSNC's continued and vigorous litigation in this Adversary Proceeding for nine months following the date of that class notice. If the Jemsek Defendants had any inkling that this Adversary Proceeding might be affected by the Settlement, BCBSNC's conduct would certainly dispel the notion.

Thus, while legally sufficient under Rule 23, the class notice left the Jemsek Defendants blissfully unaware of the peril in which the Settlement placed their counterclaims.[22] Of course, had BCBSNC provided any of these disclosures, the relationship between the *Love* Case and this Adversary Proceeding would have been made known in time to avoid the legal train wreck that followed.

### E. Sanctions to Be Imposed

For violating its disclosure obligations and a federal court injunction, BCBSNC is subject to serious sanctions under several different legal authorities.

#### i. Sanctions Based Upon This Court's Inherent Powers

Federal courts have the inherent authority to control various aspects of the cases before them so that they can protect their proceedings and judgments in the course of discharging their traditional responsibilities. *See Gwynn v. Walker (In re Walker)*, 532 F.3d 1304, 1309 (11th Cir. 2008); *U.S. v. Moussaoui*, 483 F.3d 220, 236–37 (4th Cir.2007)(citing *Degen v. U.S.*, 517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996)). One aspect of the inherent authority is the power to sanction errant litigants. *See Longcrier v. HL–A Co., Inc.*, 595 F.Supp.2d 1218, 1229 (S.D.Ala. 2008) (citing *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir.2002)("Courts have the inherent authority to control the proceedings before them, which includes the authority to impose 'reasonable and appropriate' sanctions.")).

To impose sanctions under its inherent powers, the court must first find bad faith. *In re Walker*, 532 F.3d at 1309. "A party [ ] demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Id.* (citations omitted). The court must provide the sanctioned party due process both in finding the requisite bad faith and in assessing fees. *Id.*

Under its inherent authority, a court has a wide litany of sanctions that it may impose to deter or punish inappropriate conduct. One, undisputedly, is the ability to tax a party with the other side's

---

**22.** Considering the relative enormity of the value of their Counterclaims in comparison to what they could have expected under the Settlement payoff, had they known, the Jemsek Defendants would undoubtedly have preserved their Enjoined Counterclaims by opting out of the class. Further, no reasonable person would have opted to stay in that class knowing that he still had to defend against the creditor's $16,325,974.78 claim in another court.

costs and attorneys fees. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Further, in appropriate cases, a court may also dismiss a party's claims or default it on its opponent's claims. *See Moussaoui,* 483 F.3d at 236–37; *Anderson v. Foundation for Advancement, Education and Employment of American Indians,* 155 F.3d 500 (4th Cir.1998).

Dismissal of a party's claims is a severe sanction and must be reserved for egregious cases where there is a clear record of delay or contumacious conduct and where lesser sanctions would not serve the best interests of justice. *Gardendance, Inc. v. Woodstock Copperworks, Ltd.,* 230 F.R.D. 438, 450–52 (M.D.N.C. 2005). Dismissal is also appropriate where there has been flagrant bad faith by a party or disregard of a party's responsibilities to the court. *Id.*

When considering dismissal as a sanction, the Fourth Circuit examines: (1) the degree of personal responsibility of the plaintiff; (2) the amount of prejudice caused to the defendant; (3) the existence of repeated violations; and (4) the existence of sanctions less drastic than dismissal. *Id.* Default of a party on its opponent's claims is appropriate under the same four-factor test. *Anderson,* 155 F.3d at 504.

#### ii. Codified Sanctions Provisions

In this case, misconduct may also be sanctioned under three relevant provisions of the bankruptcy laws: FRBP 7037 (Failure to Make Disclosures or Cooperate in Discovery: Sanctions); Code Section 105 (Power of Court); and Code Section 510 (Subordination).

##### a. Rule 7037

Federal Rule of Civil Procedure 37(c)(1) states:

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed.R.Civ.P. 37(c)(1). It also provides authority for a court to impose sanctions "if a party fails to make a disclosure required by Rule 26(a)." Fed.R.Civ.P. 37(a)(3)(A). Rule 37 applies in bankruptcy adversary proceedings through FRBP 7037. Under Rule 37, a court may impose a variety of sanctions for failure to comply with discovery orders, ranging from attorney's fees up to dismissal. *Gardendance,* 230 F.R.D. at 450.

##### b. Section 105

Bankruptcy Code "§ 105 grants broad powers to bankruptcy courts to implement the provisions of Title 11 and to prevent an abuse of the bankruptcy process." *In re Volpert,* 110 F.3d 494, 500 (7th Cir.1997). These broad powers include the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title ... or to prevent abuse of process." 11 U.S.C. § 105(a).

Further, § 105 of the Bankruptcy Code grants bankruptcy courts "broad remedial authority beyond what is

available pursuant to a court's inherent contempt authority." *In re Rojas*, 2009 WL 2496807 at *7 (Bankr.S.D.Tex. August 12, 2009). § 105 "does not require a court to use the least restrictive means to carry out the requirements of the Code." *In re Rodriguez*, 396 B.R. 436, 458 (Bankr. S.D.Tex.2008). The language of § 105 does not limit the authority granted to bankruptcy courts to that which is necessary to prevent abuse of process or to protect the policies underlying the Code; Congress added explicitly deferential, discretionary language to the statute with the words "or appropriate." *See id.*

■ Given its reach, § 105 has been employed to sanction parties and attorneys to a bankruptcy case in a variety of ways, ranging from monetary sanctions to outright dismissal of a party's claims or case. *See, e.g., In re Casse*, 198 F.3d 327, 336–39 (2d Cir.1999) (using § 105 to sanction a serial filer debtor by dismissing his chapter 11 case with prejudice); *In re Kozich*, 406 B.R. 949, 956 (Bankr.S.D.Fla.2009) (sanctioning contumacious debtor-plaintiff via § 105 by forbidding him to ever bring suit before the bankruptcy court again, on a pro se basis); *In re Evergreen Security, Ltd.*, 384 B.R. 882, 938 (Bankr.M.D.Fla. 2008) (imposing sanctions based on § 105, inter alia, by requiring sanctioned party to pay opponent's attorneys' fees and costs, as well as enjoining sanctioned attorneys

from practicing before the bankruptcy court for a minimum of five years).

### c. Section 510

■ Finally, although not mentioned in the parties' written submissions,[23] a bankruptcy court may also deal with improper creditor conduct under code § 510. Under "principles of equitable subordination," the bankruptcy court may "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest. . . ." 11 U.S.C. § 510(c).

■ The Fourth Circuit has adopted a three-condition test under § 510. *In re ASI Reactivation, Inc.*, 934 F.2d 1315 (4th Cir.1991) (adopting the Fifth Circuit's test from *Holt v. Federal Deposit Ins. Co. (In re CTS Truss, Inc.)*, 868 F.2d 146, 148 (5th Cir.1989)). Equitable subordination requires a finding that: 1) the claimant engaged in fraudulent or inequitable[24] conduct; 2) that conduct resulted in injury to creditors; and 3) subordination would be consistent with other bankruptcy law. *Id.* at 1321.

The bankruptcy court is obliged to make explicit findings on each of the three elements when granting equitable subordination. *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699–700 (5th Cir. 1977).

**23.** Neither side had an incentive to address this provision. Reordering the priority of creditors' allowed claims against the bankruptcy estate does not reduce the total debts owed by the debtor. Since any allowed claims owing to BCBSNC may prove to be nondischargeable, the Jemsek Defendants seek dismissal of the same, not subordination. However, even subordination of BCBSNC's claims would improve the position of other creditors. Given the deleterious effects of BCBSNC's behavior on other creditors, and the divergence in the interests of the debtors and those

creditors, the Court raises this provision sua sponte, as an alternative to dismissal.

**24.** While the Fourth Circuit doesn't specifically term "inequitable" conduct as a ground for subordination, it adopts the Fifth Circuit's test from *In re CTS Truss* as the standard. Both *CTS Truss* and the Fifth Circuit's landmark decision, *In re Mobile Steel*, 563 F.2d 692, 703 (5th Cir.1977) state that inequitable conduct is an alternative ground for subordination.

### iii. Application of Authorities to these Facts

#### a. Inherent Powers

 Bad faith is easily found here. BCBSNC settled its case with the *Love* class on April 27, 2007, but never raised res judicata or release as an affirmative defense. BCBSNC did not reveal, describe, or produce the Settlement even though it knew the settled claims in the *Love* Case were "identical" to the Counterclaims filed by the Jemsek Defendants. It did not mention this suit to its opponents, the two courts, or to the Panel. As a result, counterclaims worth potentially millions of dollars were lost, this litigation was delayed for more than two years, sizeable attorneys fees and costs were necessitated for BCBSNC's opponents and an inordinate amount of court time was needlessly consumed.

Due process has been afforded BCBSNC. The current motion has been revised several times. The Motion and the Jemsek Defendants' briefs clearly set forth the factual and legal basis for the sanctions they seek. The motion, in one form or another was pending for months before a hearing was held. Both sides have fully and voluminously presented their evidence and legal authorities. BCBSNC was permitted to file a post hearing brief.

For all of these reasons, sanctions under the Court's inherent powers are justified.

#### b. Supplemental Authorities

On these facts and for the same essential reasons, sanctions are warranted under FRBP 7037 and Code § 105.

#### c. Section 510

 Finally, if not dismissed, grounds exist to subordinate any allowed claims by BCBSNC to those of the Jemsek Defendants' other creditors. Assuming that BCBSNC holds allowable claims on the facts presented, it appears BCBSNC has engaged in fraudulent conduct. Even if not willful, its reckless disregard of its legal obligation to disclose the dual litigation in a timely fashion is certainly "inequitable." As noted above, through the loss of the Enjoined Counterclaims and the needless run up of the Jemsek Defendants' legal fees, which are administrative expenses in this bankruptcy case, BCBSNC's conduct resulted in tremendous injury to other creditors. Subordination is entirely consistent with other bankruptcy laws.

### iv. Specific Sanctions to be Imposed

#### a. Taxation of Costs and Fees

 At a minimum, BCBSNC should be charged with its opponent's costs and attorney's fees relating to these matters. *Chambers,* 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Such charges should include all of the Jemsek Defendants' allowable costs and attorneys' fees incurred 1) in connection with this Adversary Proceeding from May 31, 2007 forward, 2) pursuing discovery responses prior to May 31, 2007, and 3) defending against BCBSNC after March 31, 2008 in the Florida Court and on appeal during the *Love* injunction proceedings.

#### b. Fines/Damages to the Offended Party Equivalent to the Enjoined Counterclaims will not be Imposed

 The Jemsek Defendants also ask this Court to impose sanctions upon BCBSNC in an amount equal to their Enjoined Counterclaims. This demand for relief is problematic.

When a court enters a "death penalty" sanction against a party for egregious behavior, it typically does one of two things (or both): (1) it dismisses a party's claims against its opponent, with prejudice, or (2) it defaults the party on its opponent's claims.

The Jemsek Defendants' Enjoined Counterclaims no longer exist, as they have been settled by *Love* and dismissed with prejudice. The Jemsek Defendants flirted with contempt charges in the Florida Court by even requesting this action.

By seeking sanctions equal to their Enjoined Counterclaims, the Jemsek Defendants ask this Court to do indirectly that which they cannot do directly. By recasting their demand as one for sanctions and not damages, they seek to sidestep the *Love* injunction. As lamentable as the loss of these Counterclaims may be, this Court cannot oblige them.

Additionally, leveling sanctions equivalent to the value of the Enjoined Counterclaims is unavailable because the value of these counterclaims is unknown and undeterminable. Although the Jemsek Defendants proffer that the total value of all Counterclaims, the Enjoined Counterclaims included, is approximately $20 million, that assertion is pure conjuncture. The Court has no feasible method of establishing their value short of a trial, and, given the injunction, a trial is precluded.

Therefore, this Court will not award a fine or damages equating to the value of the Enjoined Counterclaims.

### c. Dismissal of the Offending Party's Claims

■■■■ While defaulting BCBSNC on the Enjoined Counterclaims is not an available sanction, dismissal of BCBSNC's claims against the Jemsek Defendants is both a viable and appropriate option.

In fact, on these facts, nothing short of dismissal of these claims, with prejudice, will vindicate the wrongs done by BCBSNC to the Jemsek Defendants, their creditors and the courts. Although dismissal is a severe sanction, this is an egregious case, and one with a clear record of contumacious conduct. *Kozich*, 406 B.R. 949, 956. ("contumacious behavior" sufficient to support dismissal). BCBSNC has acted in flagrant bad faith and with blatant disregard for its responsibilities to the courts and the JPML. Moreover, this is not an isolated violation of a single rule or order. The nondisclosure violations were repeated multiple times, over a prolonged period of time, and in two different courts.

The case for dismissal with prejudice is buttressed by the fact that the sanctionable conduct appears to be that of BSBSNC itself, and only to a lesser extent (if at all) that of its counsel.[25] The personal responsibility of BCBSNC in this matter is undeniable, and, again, the case presents extreme prejudice.[26] Hundreds of thousands of dollars in fees and expenses were needlessly expended, the Enjoined Counterclaims were lost, and a considerable amount of judicial resources were wasted due to BCBSNC's actions.

Finally, and for the same reasons, there are no lesser sanctions that may adequately redress the wrongs committed or serve the best interests of justice. *Garden-*

---

**25.** Here, we refer to BCBSNC's counsel generally, not Mr. Doherty and the Kilpatrick Stockton firm. Having heard and observed Doherty at the April 17, 2008 hearing, this Court believes that Doherty and the attorneys representing BCBSNC in the Adversary Proceeding were unaware of the significance of the *Love* injunction until the spring of 2008.

**26.** There is a strong consensus among courts that dismissing a case with prejudice is more justifiable when the sanctionable conduct is attributable not to unprofessional attorney behavior, but rather to the clients or the parties themselves. *See, e.g., Domingos v. U.S.*, 883 F.Supp. 16, 18–19 (E.D.N.C.1993) (noting that even when counsel's dilatory tactics warrant a dismissal, a dismissal with prejudice is justified if a "degree of personal responsibility" on the part of the party itself can be shown).

*dance,* 230 F.R.D. 438, 450–52 (M.D.N.C. 2005).

As another court recently observed:

It is fundamentally unfair to attempt to manipulate two simultaneous court proceedings in a manner designed to avoid a decision on the merits while at the same time attempting to obtain a favorable result on the underlying issues on a non-merits basis. It is further fundamentally unfair to consent to the disposition of a matter in one tribunal while at the same time attempting to obtain substantive relief in another tribunal. Finally, it is unprofessional and inconsistent with a lawyer's ethical responsibilities repeatedly to refuse to abide by court orders.

*In re Forte,* 2008 WL 788647, at *3, *5 (Bankr.D.Ariz.2008). In *Forte,* the court was aware of the cases pending in both courts; however, the plaintiffs' attorneys used deceptive tactics to mislead the bankruptcy court as to their actions in the other court proceeding. Therefore, the bankruptcy court dismissed the plaintiff's complaint with prejudice. *Id.*

BCBSNC has managed to bar its opponents' compulsory counterclaims even as it seeks recovery on its own claims. It has done so purposely or, at best, in reckless disregard for its responsibilities to the courts, its opponents, and the JPML. Under any of the aforementioned authorities, whether inherent powers, Section 105 or Rule 7037, dismissal of BCBSNC's primary claims is warranted.[27]

**ACCORDINGLY,** the Jemsek Defendants Motion for Sanctions is **GRANTED** to the following extent:

1. BCBSNC will be taxed with the Jemsek Defendants costs and attorney fees as described above. The Jemsek Defendants are directed to file and serve within thirty (30) days, a detailed submission of the costs and fees which they believe fall within this award. BCBSNC shall then be afforded an additional thirty (30) days to review, and file written objections, to the same.

2. BCBSNC's claims raised in this Adversary Proceeding are **DISMISSED WITH PREJUDICE,** and its filed claims in the base bankruptcy cases, claim number thirty (30) in case 06–31766 and claim number nineteen (19) in case 06–31986, are **DISALLOWED.**

The remainder of the relief sought by the Jemsek Defendants' Second Amended Motion for Sanctions is **DENIED.**

**SO ORDERED.**

---

**27.** Section 510 subordination of BCBSNC's allowed claims would be in order but for the fact that the claims are to be dismissed.